UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :
:
v. :
: Case No: 24-cr-469 (EGS)
TREMAYNE MATTHEWS, :
:
Defendant. :

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Tremayne Matthews lied to the United States government more than 200 times in seeking to gain employment as a federal employee. *See* Final Presentence Investigation Report, ECF No. 14 ("PSR"), at ¶ 13. On the basis of blatantly false information, Matthews was hired by multiple federal agencies: the FDA, the IRS, DHHS, and the USPTO. In each case, he was paid a yearly salary of more than $100,000 to perform work he was not qualified to do. And when he was called out and fired, he had the gall to file an appeal with the Merit Systems Protection Board and the OPM Suitability Executive Agency. In those appeals, he submitted a lengthy packet of documents, including multiple notarized affidavits purportedly from individuals vouching for his work. Matthews forged those documents, too. Adding insult to injury, Matthews got $75,000 to settle that appeal. To reflect the nature and circumstances of his conduct, his personal history and characteristics, and the other factors set forth at 18 U.S.C. § 3553(a), the Court should sentence him to six months of incarceration followed by three years of supervised release. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## BACKGROUND

In 2018, nine years after Matthews graduated from American University, he started to apply for jobs with the federal government using a fake resume he had copied from one of his

previous co-workers at the Department of State. PSR ¶¶ 14, 65. What is most interesting about these applications is that Matthews had already been employed as an Audio-Visual Specialist with the National Transportation Safety Board earning $100,000 per year. *Id*. at ¶ 66. Regardless of the motivation, Matthews stole a co-worker's work experience, inserted it into his own resume, and applied for more than 200 applications using the fraudulent document.

On the basis of these misrepresentations, Matthews got a job as an Audiovisual Specialist with the Food and Drug Administration ("FDA") in May 2019, the Internal Revenue Service ("IRS") in December 2019, the Department of Health and Human Services Office of Inspector General ("DHHS") in August 2021, and the U.S. Patent and Trademark Office ("USPTO") in August 2022. *Id*. at ¶ 10. As part of his job applications, Matthews also submitted three videos on which he claimed to have done significant audio-vidual work. In fact, he had not done any work on the videos. For more than three and a half years, Matthews collected more than $100,000 per year from the public fisc in jobs for which he was not qualified and that he had lied to get.

More troubling, however, is Matthews's conduct after his fraud came to light in 2019. In his work with the FDA, he submitted videos to his supervisors that he claimed to have created. His supervisors learned, however, that Matthews had not in fact created the videos he was claiming to be his own. PSR at ¶ 18. The FDA dug a little deeper and discovered that Matthews had also lied about videos he had submitted as part of his application for employment. After learning this, the FDA issued Matthews a Notice of Proposed Removal. *Id*. Instead of accepting that his scheme was up, Matthews accepted a job with the IRS—that he had also obtained on the basis of the same fake resume and misrepresentations about his work product. *Id*. at ¶19. Matthews continued to apply for federal government employment using the fabricated resume until at least June 2020, more than seven months after his fraud had been discovered by the FDA.

2

Id. at ¶ 13, 20.

More troubling still, however, Matthews decided to continue his scheme to defraud the government in an even more brazen manner. Once the IRS learned that Matthews had submitted the same false resume and fake videos in his application to their agency, and had resigned from the FDA in lieu of termination, the IRS referred his case to the Office of Personnel Management ("OPM") Suitability Executive Agent ("SEA") in early 2020. PSR ¶ 21. The OPM SEA issued a letter describing Matthews's misconduct and lies and concluded that he was unsuitable for federal employment. *Id*. In response, Matthews submitted a packet of information in rebuttal—hundreds of pages of documents—that was replete with boldfaced lies. *Id*. at ¶ 23. He included fake affidavits from associates that claimed he had performed the work on the videos he used in his employment applications. *Id*. Not true. The affidavits appeared to have been notarized, which was also a fabrication. The rebuttal packet included email exchanges that appeared to be from Matthews's associates vouching that he had performed the work on the videos. *Id*. Matthews had doctored those emails, too.

One affidavit submitted to the OPM SEA in particular demonstrated the lengths to which Matthews was willing to go to perpetuate his scheme. In order to explain his fake resume, Matthews submitted a notarized affidavit from "Sherlise Jefferson," a purported career coach. PSR at ¶ 25. In the affidavit, "Ms. Jefferson" claimed that she had accidentally included the false information listed on Matthews's resume. *Id*. "Ms. Jefferson" also explained that she had been responsible for submitting the incorrect resume to various federal agencies on Matthews's behalf. *Id*. Matthews included email exchanges between himself and the email address allegedly used by Jefferson, sherlisedjeffersonresumes@gmail.com, that appeared to corroborate the story that Jefferson was the source of the resume mix-up. *Id*.

The entire Sherlise Jefferson story was completely bogus. None of those statements or emails or affidavits attributed to Jefferson were true. In reality, Matthews had created the sherlisedjeffersonresumes email account himself, two weeks after receiving the OPM SEA letter notifying him that his suitability for federal employment was under investigation. PSR at ¶ 26. Rather than own his misconduct, Matthews concocted an elaborate cover-story to continue on the government's dole.

On November 2, 2020, the IRS notified Matthews that he would be terminated. PSR at ¶ 27. Once again, when faced with a fork in the road, Matthews opted to continue his campaign of lies. He appealed the IRS's termination to the Merit Systems Protection Board ("MSPB") on the basis that he had been fired during his probationary period. In his MSPB appeal, he once again submitted the forged, fabricated, and doctored documents he had submitted to the OPM SEA. And he won. Based on Matthews's probationary status, the MSPB determined that the IRS had run afoul of civilian protection rules when the agency terminated him. Matthews received a $75,000 settlement because of protections owed to federal government employees, protections that Matthews never should have had in the first place.

That's not all. Matthews continued to apply to federal government positions in the years following, accepting prestigious and lucrative jobs with DHHS and USPTO. He also lied under penalty of perjury on those applications, too. In filling out mandatory employment forms, Matthews lied about whether he had ever resigned voluntarily from any position after being informed that he would be fired or whether he had resigned by mutual agreement following allegations of misconduct.

Following a years-long quest to avoid responsibility and grift off of taxpayers, Matthews accepted responsibility on November 13, 2024, and pled guilty to a criminal information charging

4

him with a scheme to conceal a material fact, in violation of 18 U.S.C. § 1001(a)(1).

## ARGUMENT

Defendant Tremayne Matthews perpetrated a long con against the United States government. He forged documents. He lied on employment applications. He went so far as to create a fake email address and submit fraudulent, supposedly notarized documents to the MSPB in a quasi-judicial proceeding. Such intentional misconduct is not a good look. But it is even more troubling that Mathews knew better. For the reasons set forth below, a within-Guidelines sentence of 6 months followed by 3 years of supervised release is an appropriate sentence that achieves the goals of sentencing.

### A.     The Applicable Sentencing Guidelines

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," they are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

Here, the parties are in agreement with the Guidelines range to be 0 to 6 months, as set forth in the PSR. PSR ¶ 77. Because the recommended imprisonment range falls within Zone A of the Sentencing Table, the Guidelines provide that the minimum term may be satisfied in a variety of ways, including a probationary sentence that includes home detention. *See* PSR ¶ 86, USSG §5B1.1. The Guidelines also note that a non-prison sentence is generally appropriate for defendants who are in Zone A of the Sentencing Table if, like Matthews, they received a zero-point offender adjustment. USSG §5C1.1, comment. (n.10).

### B.     The § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7). Although some of the § 3553(a) factors weight against a period of incarceration for Matthews, the government submits that Matthews's sustained and intentional falsehoods merit a period of incarceration, as explained in more detail below.

*First,* the nature and circumstances of Matthews's offense underscore the seriousness of his misconduct. Matthews's fraud was undeniably serious, costing the government hundreds of thousands of dollars. Nor was his conduct a momentary lapse of judgment or a few isolated incidents. Matthews lied again and again and again. He lied to obtain employment in the first place. He lied to his supervisors about his work product. He lied to the OPM SEA and MSPB in order to keep the money flowing. Each time that Matthews faced a choice—to abandon his scheme and be glad that he did not get caught, or to continue to lie to the government—he opted for the money. Not only did he do so repeatedly, he went to great lengths to cover up his crimes. Although the Sherlise Jefferson story may have been creative, it was abjectly wrong. The nature and seriousness of his conduct reflects the need for a custodial sentence.

*Second*, a period of incarceration would promote respect for the law, provide just punishment, and deter Matthews and other like him from similar kinds of criminal conduct. White-collar crime is always difficult to detect, investigate, and prove. The investigation into such

6

conduct is not as simple as smelling marijuana and conducting a stop and frisk. And sending a strong deterrent message in cases of misconduct committed by public employees is especially important, particularly in the District of Columbia where so many federal government workers are employed. *See generally United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations omitted) (noting white collar crime and public corruption are "prime candidates for general deterrence" because they often are "more rational, cool, and calculated than sudden crimes of passion or opportunity."). Matthews also abused the trust placed him as a public employee. His conduct thus erodes the trust that the public at large has in our governmental institutions. Moreover, by submitting forged affidavits and documents to a quasi-judicial body, such as the MSPB, Matthews demonstrated a flagrant disregard for the judicial and administrative process, two institutions that depend heavily on the truthfulness of parties that appear before them.

*Third*, the need to avoid unwarranted sentencing disparities also favors a period of incarceration. A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013). Sentencing Matthews to a probationary sentence as recommended by the U.S. Probation Office also runs the risk of creating sentencing disparities based on socio-economic class. *See generally United States v. Levinson,* 543 F.3d 190, 201 (3d Cir. 2008); *accord United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir.2006). Crime is crime, no matter how sanitized white-collar crime may appear when juxtaposed with violent conduct.

*Fourth*, Matthews's history and characteristics do not mitigate against the imposition of a period of incarceration in this instance. The PSR paints a picture of a well-adjusted, college-

7

educated man who had a table upbringing. PSR ¶ 52-54. That history makes Matthews's conduct even more troubling and difficult to understand. Matthews has been offered a wealth of opportunities in his life, far more than many defendants who appear before this Court. Rather than apply for jobs for which he was qualified, Matthews felt entitled to a prestigious one with a six-figure salary. His history and characteristics cannot explain his willingness to lie and steal in pursuit of a job.

    **C.**    **Restitution**

Matthews's criminal conduct is governed by the Mandatory Victims Restitution Act, 18 U.S.C. §3663A ("MVRA"), and accordingly, the Court must impose restitution. Because the amount of restitution in this case cannot be determined with perfect accuracy, the parties have agreed that Matthews caused at least $75,000 in loss to the United States. The government requests that the Court order Matthews to pay restitution to the federal government in that amount.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a Guidelines-compliant sentence of 6 months of incarceration, followed by three years of supervised release, and the mandatory $100 special assessment.

                                                  Respectfully submitted,

                                                  EDWARD R. MARTIN, JR.
                                                  UNITED STATES ATTORNEY

By:    /s/ *Christopher R. Howland*
           Christopher R. Howland (DC Bar 1016866)
           Assistant United States Attorney
           Fraud, Public Corruption, and Civil Rights Section
           601 D Street, N.W.
           Washington, D.C. 20530

(202) 252-7106  
christopher.howland@usdoj.gov